FILED

DEC 19 2022

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

FOR PUBLICATION
**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA**

In re:                                    )
                                          )
SVENHARD'S SWEDISH BAKERY,                )    Case No. 19-15277-C-11
                                          )    Docket Control Nos. DT-61 & 62
                      Debtor.             )
_____)

### OPINION ON MOTION TO APPROVE COMPROMISE

CHRISTOPHER M. KLEIN, Bankruptcy Judge:

It was a great settlement: extinguish a $46 million liability for $3 million on the condition of adherence to a precise payment schedule. The entity that acquired the debtor's business thwarted payments, caused default, and let three years pass. Now defending lawsuits seeking $46+ million, the acquirer wants to use Bankruptcy Code § 365 to revive the discounted payment agreement.

The salient question is: whether a garden-variety discounted payment agreement to release a large debt contingent on prior full payment of an agreed smaller sum under specific terms is an "executory contract" that may be assumed and assigned per Bankruptcy Code § 365 over the creditor's objection.

The answer is: this contract is not a § 365 executory contract. First, the agreement lacks the mutuality of obligation required to constitute a § 365 executory contract. Second, en banc law of the circuit confirms it is not executory. Third, it is a contract to extend financial accommodations to the debtor that § 365(c)(2) excludes from assumption and assignment.

The fact the proposed assumption comes by way of the Ninth Circuit Appellate Mediation Program does not alter the equation.

The motions to assume the contract and to approve the compromise are both DENIED. The contract is not an executory contract that can be assumed and assigned. The compromise flunks the governing "fair and equitable" test because probability of success in litigation of the § 365 assumption/assignment question is zero and because the creditor holding more than 82.5% of the unsecured debt in the chapter 11 case objects.

## Parties

The contestants are chapter 11 debtor Svenhard's Swedish Bakery, United States Bakery (USB), which acquired the Svenhard's business, and the Bakery & Confectionery Union & Industry International Pension Fund (Pension Fund).

The Pension Fund filed a proof of claim for $45,967,500.92 based on withdrawal liability occasioned by Svenhard's termination, allegedly at USB's direction and supervision, of its bakery operations in Oakland, California.[1]

Svenhard's is suing USB on eight counts based on USB's acquisition of Svenhard's and its termination of Svenhard's

---

[1]For convenience, the claim is described herein as $46+ million and uses the term "withdrawal liability" to conflate the withdrawal and contribution liabilities. The $45,967,500.92 proof of claim as of the December 19, 2019, case filing reflects a "withdrawal liability" and a "contribution liability" plus accrued interest. The "withdrawal liability" is $39,629,322.96, plus interest at a rate prescribed by PBGC regulations from May 1, 2016. The "contribution liability" is $563,106.39, plus accrued interest. Complaint, ¶¶ 48 & 56, <u>Board of Trustees of the Bakery and Confectionery Union and International Union Pension Fund v. United States Bakery, Mountain States Bakeries LLC, Central California Baking Company</u>, (filed 11/10/20), No. 1:20-cv-01587-DAD-BAM, U.S. Dist. Ct. E.D. Cal.; transferred to D. Or., note 3 <u>infra</u>. Dkt. 493.

business: (1) Successor Liability; (2) Breach of Fiduciary Duty; (3) Aiding and Abetting Breach of Fiduciary Duty; (4) Fraud; (5) Conversion; (6) Rescission; (7) Violation of California Business & Professions Code § 17200; and (8) Equitable Subordination.[2]

The Pension Fund is suing USB and two USB subsidiaries on a theory of successor liability to collect Svenhard's unpaid pension obligations under ERISA and 29 U.S.C. § 1392.[3]

Also pending is Ninth Circuit appeal No. 21-16991 from the District Court's dismissal of USB's appeal from this court's denial of USB's motion to convert the chapter 11 to chapter 7. The District Court ruled it lacked jurisdiction because USB did not obtain leave to appeal the interlocutory order.

Through appellate mediation, from which the Pension Fund was excluded, USB and Svenhard's agreed to make peace by way of Svenhard's assuming the defaulted discounted payment agreement with the Pension Fund for which USB would make the payments.[4]

---

[2]<u>Svenhard's Swedish Bakery v. United States Bakery; Mountain States Bakeries LLC; Central California Baking Company; Murrey R. Albers; Michael Petitt; and Kenneth Hall</u>, U.S. Dist. Ct. D. Or. No. 20-cv-01454-SI. It was filed in this court as Adv. No. 2020-1029. The reference was withdrawn and the civil action transferred to the District of Oregon.

[3]Note 1, <u>supra</u>. Now pending in the U.S. District Court for the District of Oregon as No. 3:21-cv-00617-SI.

[4]The full terms of the settlement included: (1) Entry of a final, non appealable order assuming and assigning the discounted payment agreement to USB as a valid and subsisting contract; (2) USB funds the amount to cure the default on the agreement; (3) USB pays the debtor $3,000,000; (4) USB forfeits all rights and claims to assets of the debtor's estate; (5) Debtor and USB will dismiss with prejudice Adv. No. 20-01030, 9th Circuit Case No. 21-16991, and Oregon District Court Case No. 20-cv-01454-SI; (6) USB withdraws Proof of Claim No. 54; and (7) Mutual releases.

These motions ask this court to ratify that treaty.[5]

Facts

USB acquired the Svenhard's bakery business in a multi-year creeping acquisition beginning in 2014, featuring multiple transactions with lease-backs and license-backs that permitted operations to continue in the Svenhard's name.

In 2015, allegedly at USB's direction, Svenhard's operations were moved from Oakland, California, to Exeter, California, where Svenhard's continued to operate under a lease-back from USB.

The relocation to Exeter occasioned termination, effective December 4, 2015, of a collective bargaining agreement with Local 125 of the Bakery, Confectionery, Tobacco Workers & Grain Millers International Union according to which Svenhard's was required to contribute to the ERISA-qualified Pension Fund.[6]

The Pension Fund notified Svenhard's, pursuant to 29 U.S.C. § 1399, there was an accrued Withdrawal Liability said to be $50,150,043, payable in monthly installments of $162,941. In addition, there was a Delinquent Contribution Liability of $514,847.67 on account of severance and accrued vacation.

Svenhard's did not timely request review of the assessment of Withdrawal Liability pursuant to 29 U.S.C. § 1399. Hence, the full amount became due and owing.

---

[5]Debtor's Motion to Approve Settlement Agreement With United States Bakery Pursuant to Federal Rule of Bankruptcy Procedure 9019, DC No. DT-061, Dkt 459; Debtor's Motion to Assume and Assign Settlement Agreement With Confectionery Union and Industrial Pension Fund, DC No. DT-062, Dkt 461.

[6]Svenhard's Partnership, L.P., was a signatory but has disappeared from the dispute for unexplained reasons.

1  Svenhard's pled poverty and eventually persuaded the Pension
2  Fund to agree to a discount on the uncontested liabilities based
3  on Svenhard's supposed financial condition.

4  A discounted payment agreement encompassing both Withdrawal
5  Liability and Contribution Liability was executed April 15, 2019,
6  between the Pension Fund and Svenhard's requiring monthly
7  payments totaling $21,080.80.

8  The terms for the Withdrawal Liability, stated in the
9  agreement as $39,105,840, provided for Svenhard's to make 240
10  monthly payments of $12,500/month (i.e. a total of $3,000,000),
11  upon completion of which the entire $39,105,840 (plus interest
12  from May 1, 2016) would be discharged.

13  The $3,000,000 discounted Withdrawal Liability could be
14  prepaid at any time by paying all remaining monthly installments,
15  discounted to present value at a rate of 5.1%.

16  The Delinquent Contribution Liability payment agreement
17  capitalized interest accrued as of the date of the agreement and
18  provided for Svenhard's to pay $598,482.96 at a rate of $8,580.80
19  per month, amortizing the debt at a rate of 5.25% until paid in
20  full, which could be by prepayment of the unamortized amount.

21  If all required discounted payments of the Withdrawal
22  Liability were not made, then the full non-discounted amount
23  (stated as $39,105,840) would be due with interest at rates
24  prescribed by Pension Benefit Guaranty Corporation regulations
25  calculated from May 1, 2016, with credit only for amounts
26  actually paid.

27
28

1    If all required payments on the Delinquent Contribution
2 Liability were not timely paid, then the entire unamortized
3 amount of that liability would be due with interest at 5.25%.

4    Paragraphs 12 and 14 of the discounted payment agreement
5 provided for separate releases to be provided to Svenhard's "upon
6 full payment of the amounts" required for the Withdrawal
7 Liability and the Delinquent Contributions Liability.

8    Svenhard's made the first six $21,080.80 payments (June-
9 November 2019) under the discounted payment agreement.

10    In November 2019, USB terminated its lease-back to
11 Svenhard's and took control of Svenhard's commercial bakery
12 operations, as well as possession of Svenhard's facilities.

13    USB's termination of the Svenhard's leaseback had the effect
14 of starving Svenhard's of the ability to make the $21,080.80
15 payment due December 1, 2019.

16    The Pension Fund declared a default on December 13, 2019, on
17 the $3,000,000 discounted payment agreement and gave five
18 business days in which to cure the default.

19    Svenhard's filed its chapter 11 case on December 19, 2019,
20 one day before the cure period expired. The filed proofs of claim
21 total $69,247,970.68 ($10,612,005.58 secured; $2,965,396.05
22 priority; $55,670,569.05 unsecured).

23    No payment has been made on the discounted payment agreement
24 since November 2019.

25    As noted, Svenhard's and the Pension Fund have separate
26 civil actions pending against USB in the District of Oregon.

27

28

6

1                         Jurisdiction

2          Jurisdiction is founded on 28 U.S.C. § 1334(a). A motion to

3     approve a compromise is a core proceeding for a Bankruptcy Judge

4     to hear and determine. 28 U.S.C. § 157(b)(2).

5

6                           Analysis

7          These are motions to assume the defaulted discounted payment

8     agreement and to approve as "fair and equitable" a compromise

9     premised on the proposed assumption. The compromise standards

10    provide the framework for analysis, but the central issue is

11    whether the transaction is permitted by the Bankruptcy Code.

12

13         I. Compromise Must Be "Fair and Equitable"

14         A compromise must be "fair and equitable" taking into

15    account four factors: (1) probability of success in litigation;

16    (2) difficulties, if any, in matter of collection; (3) complexity

17    of litigation involved and expense, inconvenience, and delay

18    necessarily attending it; and (4) the paramount interest of the

19    creditors and a proper deference to their reasonable views in the

20    premises. E.g., Martin v. Kane (In re A&C Properties), 784 F.2d

21    1377, 1380 (9th Cir. 1986).

22         Here, the questions of collectability and of obviating

23    complexity, expense, inconvenience and delay are overshadowed by

24    the questions of the legal merits of what is proposed and of the

25    expressed interest of creditors.

26

27

28

                              7

## II. <u>Probability of Success in Litigation</u>

The first crucial "fair and equitable" factor is probability
of success in litigation. The answer turns on whether the
discounted payment agreement is an "executory" contract that may
be assigned and assumed pursuant to § 365.

Despite the number of zeroes involved, the terms of the
discounted payment agreement are commonplace. Courts routinely
encounter compromises according to which a large sum, either
claimed or already adjudged, will be deemed fully paid on the
condition that a smaller sum is paid by a time or times certain.

From 10,000 feet, Bankruptcy Code § 365 (Executory Contracts
and Unexpired Leases) is deceptively simple.

The trustee, subject to the court's approval, may assume or
reject an executory contract. 11 U.S.C. § 365(a).

The trustee, with stated exceptions, may assign an executory
contract that has been assumed. 11 U.S.C. § 365(f)(1).


A. <u>Is the Agreement Proposed For Assumption Executory?</u>

The Bankruptcy Code does not define "executory contract."
The absence of a precise definition has bedeviled courts since
enactment of the Bankruptcy Code of 1978.

The Supreme Court has noted that the term executory contract
was intended to mean a contract on which performance remains due
to some extent on both sides, but it has not provided more
helpful guidance. <u>NLRB v. Bildisco & Bildisco</u>, 465 U.S. 513, 522
n.6 (1984)(dictum).

A leading approach to the meaning of executory contract is
that of Professor Vern Countryman, which holds that the

1  obligations of both parties must be so far unperformed that
2  failure of either party to complete performance would constitute
3  a material breach and thus excuse the performance of the other
4  party. Vern Countryman, <u>Executory Contracts in Bankruptcy: Part</u>
5  <u>1</u>, 57 MINN. L. REV. 439, 460 (1973).[7]

6      Whether a contract is "executory" is a question of fact to
7  be determined by the bankruptcy court. <u>Unsecured Creditors'</u>
8  <u>Committee v. Southmark Corp. (In re Robert L. Helms Construction</u>
9  <u>& Dev. Co.)</u>, 139 F.3d 702, 706 n.13 (9th Cir. 1998) (en banc).[8]

10

11                     1. <u>Mutuality of Obligation</u>

12      The Ninth Circuit follows the Countryman test that focuses
13  on mutuality of obligation. <u>Griffel v. Murphy (In re Wegner)</u>, 839
14  F.2d 533, 536 (9th Cir. 1988).

15      Correlatively, mutuality connotes simultaneity. When a party
16  has substantially performed its side of a bargain, such that the
17  party's failure to perform further would not be a material breach
18  excusing performance by the other party, the contract is no

19  —————————————

20      [7]There are approaches other than the Countryman analysis.
    There is a functional test and an exclusionary approach. Jay L.
21  Westbrook & Kelsi Stayard White, <u>The Demystification of Contracts</u>
    <u>in Bankruptcy</u>, 91 AM. BANKR. L.J. 481, 491-95 (2015); Jay L.
22  Westbrook, <u>A Functional Analysis of Executory Contracts</u>, 74 Minn.
    L. Rev. 227, 282-85 (1989); Michael T. Andrew, <u>Executory</u>
23  <u>Contracts Revisited: A Reply to Professor Westbrook</u>, 62 COLO. L.
    REV. 1 (1991); Am. Bankr. Inst. Comm'n to Study Reform of Chapter
24  11, 23 AM. BANKR. INST. L. REV. 1, 121-25 (2015).

25      [8]After the Supreme Court's 2018 decision in <u>Village at</u>
26  <u>Lakeridge</u>, it may be more accurate to describe the question
    whether a contract is executory for purposes of § 365 as a mixed
27  question of law and fact as to which facts predominate for which
    the standard of review is clear error. <u>U.S. Bank Nat'l Ass'n v.</u>
28  <u>Village at Lakeridge, LLC</u>, 583 U.S. ___, 138 S.Ct. 960, 966-67
    (2018).

1 longer executory. <u>Marcus & Millichamp Inc. v. Munple, Ltd. (In re</u>
2 <u>Munple, Ltd.)</u>, 868 F.2d 1129, 1130 (9th Cir. 1989).

3        As of the date of the filing of the Svenhard's chapter 11
4 petition, the discounted payment agreement nominally had
5 obligations remaining on both sides. Svenhard's obligation was
6 immediate and precise, with timely payment being of the essence.
7 The Pension Fund's obligation was contingent on prior full
8 performance by Svenhard's of its side of the bargain.

9        The narrow question is whether the mutual obligations were
10 so far unperformed that the failure by either party to perform
11 would constitute a material breach excusing performance by the
12 other party. <u>Commercial Union Ins. Co. v. Texscan Corp. (In re</u>
13 <u>Texscan Corp.)</u>, 976 F.2d 1269, 1273 (9th Cir. 1992).

14

15                        a. <u>Materiality</u>

16        Materiality of the remaining obligation is a question of
17 state law. <u>Texscan</u>, 976 F.2d at 1272; <u>Wegner</u> 839 F.2d at 536.

18        The choice of law provision in the discounted payment
19 agreement selects the law of the state of Maryland.

20        Under Maryland law, a breach is material if it affects the
21 purpose of the contract in some important or vital way. <u>In re</u>
22 <u>Cho</u>, 581 B.R. 452, 462-63 (Bankr. D. Md. 2018)(citing cases).

23        Under the terms of the agreement in question, the Pension
24 Fund has no present duty that is unperformed. Rather, its
25 obligation to execute a release is contingent on prior full
26 performance by Svenhard's of a contractual obligation as to which
27 time was of the essence. The Pension Fund need do nothing to
28 avoid a material breach.

                                10

1    Accordingly, at the time of the chapter 11 filing, the
2  Pension Fund had no obligation to perform and needed to do
3  nothing to avoid being in breach. As the time that was of the
4  essence to the contract has now long since lapsed, under Maryland
5  law the Pension Fund is not capable of a material breach.

6

7                    b. Excuse Performance

8    A contract is not executory when either party has
9  substantially performed an obligation such that failure to
10 perform further would not constitute a material breach by the
11 other party. Munple, 868 F.2d at 1130.

12    The structure of the requirement that Svenhard's have
13 substantially performed by paying in full before a release was
14 required is significant.

15    If the Pension Fund were to refuse to honor its obligation
16 to execute a release after receiving full payment, there would be
17 no performance remaining due from Svenhard's to be excused. The
18 Pension Fund's obligation matures only after Svenhard's has
19 already fully performed.[9]

20    Under Munple, such a contract is not executory.

21

22              2. Ninth Circuit En Banc Decision in Helms

23    The Ninth Circuit's en banc decision in Helms confirms this
24 court's analysis that the discounted payment agreement, which is

25

26    [9]The parties do not mention Munple. They argue that the fact
27 that separate releases required for the contribution and
   withdrawal liabilities mean that one could precede the other
28 makes the contract executory. This court is not persuaded that
   the Ninth Circuit's Munple analysis is so easily circumvented.

1  contingent on prior full performance by the debtor, is not a
2  § 365 "executory contract."

3       As noted, the question whether a contract is "executory" is
4  a question of fact for the bankruptcy court to determine. Helms,
5  176 F.3d at 706 n.13.

6       Under Helms, the question is whether at the time of filing,
7  "does each party have something it must do to avoid materially
8  breaching the contract?" Helms, 176 F.3d at 706.

9       The answer in this instance, as a question of fact, is "no."
10 On the day of filing, the Pension Plan did not have to do
11 anything to avoid materially breaching the contract. Its
12 obligation was a condition contingent on future completion of
13 full performance by Svenhard's according to the agreed schedule.

14      Performance of a duty subject to a condition cannot become
15 due unless the condition occurs or its non-occurrence is excused.
16 Restatement (Second) of Contracts § 225(1)(1981).

17      This court determines as a matter of fact, that the deferred
18 payment agreement is not a § 365 executory contract. Hence, the
19 agreement cannot be assumed and assigned pursuant to § 365.

20

21      3. Financial Accommodation Contracts under § 365(c)(2)

22      Even if it were to be concluded that the discounted payment
23 agreement does qualify as a § 365 executory contract, there
24 nevertheless remains a fatal flaw.

25      The essence of the discounted payment agreement to accept $3
26 million on account of the $46+ million withdrawal liability is
27 the provision to Svenhard's of a financial accommodation premised
28 on its alleged inability to pay the full liability.

1    Executory contracts to provide financial accommodations to
2 or for the benefit of the debtor are excluded by § 365(c)(2) from
3 eligibility for assumption and assignment.

4    Financial accommodations are extensions of money or credit
5 for the benefit of the debtor. <u>Transamerica Comm'l Fin. Corp. v.</u>
6 <u>Citibank, N.A. (In re Sun Runner Marine, Inc.)</u>, 945 F.2d 1089,
7 1092 (9th Cir. 1991).

8    Financial accommodations may include prepetition workout
9 agreements. <u>In re Prosser</u>, 388 F. Appx. 100 (3d Cir. 2010), <u>aff'g</u>
10 2008 WL 2275397 (D.V.I. 2008); <u>Steele v. Boutiette (In re</u>
11 <u>Boutiette)</u>, 168 B.R. 474, 481 (Bankr. D. Mass. 1994);

12    The deferred payment agreement is an accommodation allowing
13 Svenhard's to pay a sum of money over time that is a fraction of
14 the total liability. It benefits Svenhard's by enabling the
15 discharge of a much larger liability. Hence, it is a financial
16 accommodation for purposes of § 365(c)(2).

17    In short, as a matter of law, § 365(c)(2) dictates that the
18 movant's proposed assumption of the deferred payment agreement is
19 dead on arrival.

20

21        4. <u>No Executory Contract Capable of Assumption</u>

22    In sum, the discounted payment agreement in question is, as
23 a matter of fact, not an "executory contract" within the meaning
24 of § 365. Even if it were to be deemed executory, the nature of
25 the agreement as a financial accommodation, as a matter of law
26 dictated by § 365(c)(2), prevents Svenhard's from assuming and
27 assigning it.

28

                              13

1     It follows that the probability of success in litigation

2 seeking to assume and assign the discounted payment agreement is

3 doomed to failure. On this count alone, the mediated result is

4 not a "fair and equitable" compromise.

5

6                     III. <u>Views of Creditors</u>

7     The views of creditors and a proper deference to their

8 reasonable views in the premises also loom large in considering

9 whether the proposed settlement is "fair and equitable."

10     The Pension Fund, which holds more than 82.5% of the

11 unsecured debt in the case, objects to the assumption and

12 assignment of its discounted payment agreement.

13     The reasonableness of the Pension Fund objection may be

14 measured, first, by the obvious merit of the objector's argument

15 that the subject contract is not an "executory contract" for

16 purposes of § 365.

17     Second, in the related civil actions aimed at establishing

18 successor liability the exposure of the role of USB suggests that

19 the Pension Fund has a meritorious basis for questioning the

20 validity of the discounted payment agreement in the first place.

21     Since approving the compromise might affect issues in those

22 civil actions before they are decided on the merits, the Pension

23 Fund is taking a reasonable position that the compromise coming

24 from a mediation that excluded the Pension Fund is a subterfuge

25 designed to frustrate meritorious litigation.

26     The Committee of Unsecured Creditors supports the

27 settlement. It reasons that it is caught in the middle of the

28 Pension Fund-USB dispute, that Svenhard's may not prevail in its

                                14

1   lawsuit against USB, that it will not be possible to fund a

2   chapter 11 plan if the two civil actions in the District of

3   Oregon drag on, and that the litigation could last for a long

4   time.[10] There is considerable practical common sense in this view

5   from the holders of a small fraction of the unsecured debt,

6   nevertheless it is a distinctly minority view.

7      Balancing the competing positions of the respective creditor

8   blocs, this court is persuaded that a reasonable deference to the

9   views of the holder of more than 82.5% of the unsecured debt

10   counsels that the mediated result is not a "fair and equitable"

11   compromise.

12      This conclusion deferring to the reasonable views of

13   creditors means that the compromise flunks the "fair and

14   equitable" test regardless of whether the discounted payment

15   agreement may be assumed and assigned.

16

17      IV. <u>No Decision whether Contract "Valid and Subsisting"</u>

18      The court is also asked to determine that the discounted

19   payment agreement is a "valid and subsisting" contract.

20      USB says that the determination of a "valid and subsisting"

21   contract is an essential term of the compromise and that without

22   a binding determination on that account there is no deal.[11] It is

23

24      [10]Joinder and Separate Statement of Committee of Unsecured
Creditors Regarding Continued Hearing on Debtor's Motion to

25   Assume and Assign Settlement Agreement and Motion to Approve
Compromise, at 2-4. Dkt. 518.

26

27      [11]Specifically: "USB cannot agree to pay the Debtor
$3,000,000 unless it receives the assignment of a valid and
subsisting contract that is binding and enforceable on the

28   parties and which is no longer subject to attack in this <u>or any
other proceeding</u>." Creditor United States Bakery's Response to

apparent USB's strategy is to wipe out the Pension Fund's $46+ million claim that is being asserted in the District Court litigation in Oregon.[12]

The Pension Fund objects that judicial resolution of the question of the "validity" of the contract would be premature.

The Pension Fund notes that information has surfaced during the course of the litigation regarding the undisclosed role of USB in negotiations with the Pension Fund that, if true, suggests the agreement may have been infected by misrepresentations about Svenhard's finances that may provide a meritorious basis to renounce the 93% discount to which it agreed in the discounted payment agreement.

It is not essential to the § 365 contract assumption question that there be a determination regarding enforceability of the subject contract.

The judicial determination that a contract may be assumed or rejected under § 365 does not necessarily launder the contract of all defenses and excuses to performance that are otherwise available to the parties. Durkin v. Benedor Corp. (In re G.I. Indus., Inc.), 204 F.3d 1276, 1280-82 (9th Cir. 2000).

Furthermore, it is procedurally incorrect to embed a "valid and subsisting" determination in a motion to assume or reject a

---

Bakery & Confectionery Union & Industry International Pension Fund's Opposition to Debtor's Motion to Approve Settlement Agreement and Motion to Assume and Assign Settlement Agreement, at 2. (emphasis supplied) Dkt. 495. That "any other proceeding" is, of course, the Pension Fund's civil action in Oregon. Sly.

[12]E.g., USB : "upon assumption and assignment there will no longer be a Pension Fund claim to adjudicate in the bankruptcy proceeding because USB will have assumed all those obligations." Id. Dkt. 495.

contract. <u>Diatom, LLC v. Committee (In re Gentile Family Indus.)</u>, 2014 WL 4091001, *5 (9th Cir. BAP 2014) ("validity of a contract, if disputed, cannot be determined in the context of a motion to assume or reject. An adversary proceeding is required.").

If this court is to decide the question whether the contract is "valid and subsisting," it must do so in an adversary proceeding governed by ordinary adversary proceeding civil litigation rules, rather than summary claims procedure. The debtor, for example, could file a complaint for a declaratory judgment that the contract is "valid and subsisting" against which the Pension Fund could defend or counterclaim. Or, the Pension Fund could file its own complaint.

This court is ready, willing, and able to entertain such an adversary proceeding but must leave such a filing to the genius of counsel.

***

## Conclusion

It is no small irony that USB now wants a determination that the contract agreeing to a 93% discount of the withdrawal liability remains enforceable.

USB's actions in November 2019 terminating Svenhard's business operations stripped Svenhard's of the source of funds to continue to comply with the discounted payment agreement. If USB had done then what it now proposes three years later, there likely would be no issue because the discounted payment agreement would have continued to be performed as agreed and on schedule.

1  USB could have provided funds to maintain the Pension Fund

2  payments so Svenhard's could continue to perform its side of the

3  bargain. Instead, it was USB's reflexive hardball strategy of

4  resistence to the chapter 11 case that triggered the Pension Fund

5  default and provoked Svenhard's adversarial attack on USB, which

6  had the incidental consequence of belling the proverbial cat as

7  to facts that have exposed USB to successor liability claims.

8  Although settlement of the various disputes regarding USB's

9  acquisition of Svenhard's without burdensome trials may be

10  desired as a matter of judicial policy, the mediated compromise

11  presented to this court is not adequate to the task.

12  The motions to approve the compromise and to assume and

13  assign discounted payment agreement are DENIED.

14  Separate orders will issue.

15

16  Dated: December 19, 2022

                    United States Bankruptcy Judge

17

18

19

20

21

22

23

24

25

26

27

28